******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

STATE OF CONNECTICUT *v.* ALBERT D.*
(AC 42745)

Alvord, Moll and Bishop, Js.

*Syllabus*

Convicted, after a jury trial, of six counts of risk of injury to a child, three
counts of sexual assault in the fourth degree, two counts of sexual
assault in the first degree, and one count of attempt to commit sexual
assault in the first degree, the defendant appealed to this court. He
claimed that he was entitled to a new trial on the basis of alleged
prosecutorial improprieties during the state's rebuttal closing argument
which resulted in a denial of his due process right to a fair trial pursuant
to the six factor test set forth in *State* v. *Williams* (204 Conn. 523). *Held*:

1. The prosecutor's remarks on her own credibility and the credibility of one
of the state's witnesses in rebuttal closing argument did not constitute
improper vouching for the state's credibility: the state's response was
reasonable in light of the defendant's sharp comments in closing argu-
ment, and the prosecutor also stated, on numerous occasions throughout
her rebuttal argument, that it was the jury's job to assess credibility;
moreover, the prosecutor's comments were directly tied to the defense's
interpretation of the evidence adduced at trial and did not improperly
extend beyond the record.

2. The prosecutor's comments in rebuttal closing argument that the state's
experts were not allowed, as a matter of law, to meet with the victims
were improper and constituted an impropriety, as our law does not
prohibit expert witnesses from meeting with children who are complain-
ants of sexual assault: the prosecutor explicitly stated that the state's
experts could not meet with the victims because doing so would usurp
the jury's role in assessing credibility and, although the state correctly
articulated that the experts could speak about the behavioral characteris-
tics of child abuse victims only in general terms, such a principle is
rooted in our courts' concern for improper vouching, and is not borne
out of a rule precluding experts from meeting with complainants of
sexual assault; moreover, the prosecutor's comments explicitly mis-
stated the law and, although they may have been intertwined with proper
remarks relating to the jury's role in assessing credibility, the jury likely
could have misunderstood that the reason for the experts' general testi-
mony was because of their purported inability under the law to meet
with the victims.

3. The defendant was not deprived of his due process right to a fair trial
even though a prosecutorial impropriety occurred; under the six factor
test set forth in *Williams*, the trial, as a whole, was not fundamentally
unfair and the impropriety did not so infect the trial with unfairness as
to make the defendant's convictions a denial of due process, as the
defense initially argued that one of the state's experts was precluded
from meeting with the victims, the severity of the impropriety was
lessened by the fact that the defendant did not object to the state's
closing argument, the prosecutor's misstatement of the law was not
frequent and was confined to rebuttal argument, the impact of the
impropriety was minimal as the jury acquitted the defendant of two
counts, demonstrating its ability to filter out improper statements and
make independent assessments of credibility, any improper effect was
reduced by the court's final instructions to the jury following closing
arguments, and the state's case was fairly strong, even without physi-
cal evidence.

Argued November 21, 2019—officially released March 3, 2020

*Procedural History*

Substitute information, in one case, charging the
defendant, with six counts of the crime of risk of injury
to a child, three counts of the crime of sexual assault
in the first degree, two counts of sexual assault in the

fourth degree, and one count of the crime of attempt to commit sexual assault in the first degree, and substitute information, in a second case, charging the defendant with the crimes of sexual assault in the fourth degree and risk of injury to a child, brought to the Superior Court in the judicial district of Tolland, where the cases were consolidated and tried to the jury before *Seeley, J.*; verdict and judgment of guilty in the first case of five counts of risk of injury to a child, two counts each of sexual assault in the first degree and sexual assault in the fourth degree, and one count of attempt to commit sexual assault in the first degree, and, in the second case, verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and, *Elizabeth C. Leaming*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MOLL, J. The defendant, Albert D., appeals from the judgments of conviction, rendered following a jury trial, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2),[1] one count of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a)[2] and 53a-70 (a) (2), three counts of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A),[3] and six counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[4] On appeal, the defendant claims that he is entitled to a new trial on the basis of alleged prosecutorial improprieties during the state's rebuttal closing argument. Specifically, the defendant contends that the prosecutor (1) incorrectly stated that the state's experts were not allowed to meet with the victims, and (2) improperly vouched for her own credibility and the credibility of one of the state's witnesses. The defendant further argues that the improprieties resulted in a denial of his due process right to a fair trial pursuant to the six factor test set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). We conclude that the prosecutor's comments with regard to the purported inability of the state's experts to meet with the victims constituted an impropriety that, nevertheless, did not deprive the defendant of his due process right to a fair trial. We further conclude that the prosecutor's comments with respect to her own credibility and the credibility of one of the state's witnesses were not improper. Accordingly, we affirm the judgments of conviction.

The jury reasonably could have found the following facts. Sometime in 2003, the victims, T and A, and their parents moved into a house in Willington. T is A's older sister. T was in second grade and approximately eight years old. The defendant and his wife, who are the victims' paternal grandparents, lived in a neighboring house.[5] T saw her grandparents every day, and most of these visits occurred at her grandparents' home. T testified that she would often spend time in the defendant's bedroom watching television while the defendant slept in his bed. While T would watch television, the defendant began to sexually abuse her by way of digital anal penetration. T testified that A, who had a particularly close relationship with the defendant's wife, would also be at the defendant's home, yet would remain downstairs during these episodes. T further testified that this sexual abuse would occur "[v]ery often" and "almost every time" that she would visit her grandparents' home, from the time she began second grade in 2003 until prior to the beginning of sixth grade, when her family moved to North Carolina in 2007.[6] In addition, T described several other forms of sexual abuse perpetrated by the defendant. Each of those abuses occurred one time.

In 2005 or 2006, when A was eight or nine years old, she was watching television in the defendant's bedroom while the defendant appeared to be sleeping next to her on the bed. The defendant then lifted her shirt and proceeded to touch her breasts. A maintained that this occurrence was the only instance of abuse she suffered from the defendant. The defendant did not abuse T or A once they returned from North Carolina.

On July 14, 2015, T disclosed to her father that she had been sexually abused by the defendant. Her father drove to the defendant's residence and confronted the defendant about the accusation. Patrick O'Brien, a patrol trooper with the Connecticut State Police, responded to the defendant's home as a result of the defendant's call to the police, indicating that he had been accosted by the victims' father, who had accused the defendant of sexually assaulting T. In order to investigate further, Trooper O'Brien proceeded to the victims' residence, which was approximately twenty or thirty minutes away. Once there, Trooper O'Brien spoke with both victims but did not record a statement at that time.[7]

Scott Crevier, a detective with the Connecticut State Police, took written statements from T and A on July 15, 2015. T explained that she believed the abuse began in 2001. On August 10, 2015, T provided a second statement wherein she stated that the abuse actually began in 2003. Detective Crevier also interviewed the defendant and his wife on two occasions in August and September, 2015. In his two statements, the defendant explained that during "several strange incidents," T had initiated inappropriate sexual contact with him while he was napping in his bedroom, and he confirmed that he never told anyone about them.[8] The defendant was later arrested pursuant to two arrest warrants.

By way of amended substitute informations, the state charged the defendant in two separate informations[9] with respect to the abuse of his granddaughters. With regard to T, the operative information charged the defendant with three counts of sexual assault in the first degree, one count of attempted sexual assault in the first degree, two counts of sexual assault in the fourth degree, and six counts of risk of injury to a child. With regard to A, the operative information charged the defendant with one count of sexual assault in the fourth degree and one count of risk of injury to a child. The defendant pleaded not guilty to all counts and elected to be tried by a jury.

On November 3, 2017, following a jury trial, the defendant was convicted of all counts charged with respect to T, with the exception of one count of sexual assault in the first degree and one count of risk of injury to a child, and both counts charged with respect to A. On March 6, 2018, the court imposed a total effective sen-

tence of twenty-five years of incarceration, followed by ten years of special parole with a lifetime sex offender registration. This appeal followed. Additional facts will be provided as necessary.

On appeal, the defendant's sole claim relates to two instances of purported prosecutorial impropriety during the state's rebuttal closing argument, which he concedes were not objected to at trial. We first set forth the standard of review and the general principles of law applicable to claims of prosecutorial impropriety.

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. . . . [W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Taft*, 306 Conn. 749, 761–62, 51 A.3d 988 (2012). "Once prosecutorial impropriety has been alleged . . . it is unnecessary for a defendant to seek to prevail under *State* v. *Golding*, [213 Conn. 233, 239–40, 567 A.2d 823 (1989)], and it is unnecessary for an appellate court to review the defendant's claim under *Golding*. . . . The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in [*Williams*]." (Internal quotation marks omitted.) *State* v. *King*, 289 Conn. 496, 509–10, 958 A.2d 731 (2008).

If we conclude that prosecutorial impropriety occurred, we then decide whether the defendant was deprived of his due process right to a fair trial by considering "[1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540. "As is evident upon review of these factors, it is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole. . . . In addition, the fact that the defendant did not object to the remarks at trial is part of our consideration of whether a new trial or proceeding is warranted . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Weatherspoon*, 332 Conn. 531, 556–57, 212 A.3d 208 (2019).

I

The defendant first argues that the prosecutor committed an impropriety in her rebuttal closing argument by arguing that the state's experts were not allowed as a matter of law to meet with the victims. In response, the state contends that the statements at issue must be viewed in the context in which they were made. According to the state, that context makes clear that the prosecutor was simply explaining why the experts must testify in general terms and why their generalizations were still relevant to the case. We agree with the defendant that the prosecutor's statements that the state's experts were not allowed as a matter of law to meet with the victims constituted an impropriety.

The following additional facts are relevant to our analysis. During the trial, the state presented the testimony of two experts. First, Lisa Murphy-Cipolla, a clinical services coordinator at the Greater Hartford Children's Advocacy Center, testified that she had conducted approximately 1900 diagnostic interviews with children who claimed to be abused. She testified that there was "general agreement in the field that disclosures [of sexual abuse] are usually delayed." She further opined on the reasons for the delayed disclosure. Murphy-Cipolla did not interview either T or A, and she acknowledged that her opinions were generalizations. Second, Dr. Nina Livingston testified as an expert pediatrician in the field of child abuse and neglect. She testified that, in her experience, children often delayed disclosing sexual abuse. She also explained why children who suffer from sexual abuse akin to that allegedly suffered by the victims in the present case often do not show physical symptoms. She did not examine T or A.

During closing arguments, defense counsel argued in relevant part: "So the expert's testimony is all generalizations. She never saw [T] and she never saw [A]. And yet, she can't testify in specifics about either one of these girls, not because she not only didn't see them because she's not allowed to, but it's all generalizations. And so to say oh, well, she didn't tell because nobody responds to her. And she didn't tell because of this, and she should tell at this point in her time. It's all generalization. So the expert's testimony, give it the credit that you want to give it, but it's not specific to either one of these girls here." Defense counsel later argued: "Finally, the experts. Eh, they are what they are. They're not a good—talk in generalizations. Take them for what they're worth. They didn't see [T]. They didn't see [A]. The doctor, the doctor's useless. She was a nice woman, very smart, went to Harvard. She explained to you what the vagina is, and she told you that there would be no injury. But we didn't expect to see any injury [ten] years later, so that's not news to anybody, not you guys, nobody."

In the state's rebuttal closing argument, the prosecutor made the following remarks: "I don't think we can throw our hands up and say, eh, the experts. Yeah, they're useless. What do they really tell us? They talk in generalities. Well as you'll hear the judge instruct you, we have to talk in generalities. These, these experts can't come and meet with our complainants. It's not proper. It usurps your role as a juror. It's your decision as to what to believe and who to believe and who gets credibility. So it'd be improper to have an expert speak to that persons or people specifically. So the law only allows us to bring in experts to talk about the dynamics of child sexual abuse in generalities." The defendant specifically takes issue with the prosecutor's comment that "these experts can't come and meet with our complainants. It's not proper."

In *State* v. *Spigarolo*, 210 Conn. 359, 380, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989), our Supreme Court held that, "where defense counsel has sought to impeach the credibility of a complaining minor witness in a sexual abuse case, based on inconsistency, incompleteness or recantation of the victim's disclosures pertaining to the alleged incidents, the state may offer expert testimony that seeks to demonstrate or explain in general terms the behavioral characteristics of child abuse victims in disclosing alleged incidents." "Our cases following *Spigarolo* continue to recognize the value of generalized expert testimony to explain to the jury what might seem to the layperson to be atypical behavior exhibited by victims of various kinds of assaults, so long as that opinion testimony does not directly vouch for their credibility or veracity. . . . Subsequent case law has, however, emphasized the danger of an expert witness, *particularly one who has treated or evaluated a complainant*, vouching indirectly for that complainant's credibility as well." (Citations omitted; emphasis altered.) *State* v. *Favoccia*, 306 Conn. 770, 788, 51 A.3d 1002 (2012).

Notably, the state does not attempt to argue on appeal that expert witnesses in child sexual assault cases are prohibited as a matter of law from meeting with the complainants. Indeed, our law contains no such prohibition. Instead, the state contends that the prosecutor's remarks, when viewed in context, correctly stated that the experts could not vouch for the victims' credibility.[10] We do not agree with this characterization. The prosecutor explicitly stated that the state's experts could not meet with the victims because doing so would usurp the jury's role in assessing credibility. Although the state correctly articulated that the experts could speak about the behavioral characteristics of child abuse victims only in general terms, such a principle is rooted in our courts' concern for improper vouching, and not borne out of a rule precluding the experts from meeting with the complainants of sexual assault.

The state relies on *State* v. *Frasier*, 169 Conn. App. 500, 519, 150 A.3d 1176 (2016), cert. denied, 324 Conn. 912, 153 A.3d 653 (2017), in support of its position that the prosecutor did not misstate the law. In *Frasier*, the prosecutor, during his closing arguments, argued that he was unsure what the defendant's theory of defense was. Id., 516–17. Throughout his arguments, the prosecutor repeatedly reminded the jury that the state bore the burden of proof. Id., 517. On appeal, the defendant argued that the state committed an impropriety when it "unfairly shifted" the burden of proof to the defendant by arguing that the defendant needed to produce a "successful theory of defense for the jury . . . ." (Internal quotation marks omitted.) Id., 516–17. This court disagreed, concluding that "it [was] unlikely the jury would have understood the argument in the manner claimed by the defendant." Id., 519. Specifically, "the prosecutor speculated what the defendant might argue on his closing argument and questioned the plausibility of the defendant's arguments." Id.

The state's reliance on *Frasier* is misplaced. In *Frasier*, the state did not imply that the defendant needed, as a matter of law, to raise a defense; rather, it questioned the viability of the defense presented. Id. In contrast, the prosecutor in the present case expressly stated that "*experts can't come and meet with our complainants. It's not proper*. It usurps your role as a juror. It's your decision as to what to believe and who to believe and who gets credibility. *So it'd be improper to have an expert speak to that persons or people specifically*." (Emphasis added.) Unlike the comments made in *Frasier*, which the defendant unsuccessfully argued had implicitly misstated the law, the comments in the present case explicitly misstated the law. While the remarks may have been intertwined with proper remarks relating to the jury's role in assessing credibility, we are persuaded that the jury likely could have misunderstood the reason for the experts' general testimony to be a function of their purported inability under the law to meet with T or A. Because "prosecutors are not permitted to misstate the law"; *State* v. *Otto*, 305 Conn. 51, 77, 43 A.3d 629 (2012); and our law does not prohibit expert witnesses from meeting with children who are complainants of sexual assault, the state's comments in closing arguments to the contrary were improper. Having found prosecutorial impropriety, we set forth our analysis of the *Williams* factors in part II of this opinion.

B

The defendant also claims that it was improper for the prosecutor to remark on her own credibility and the credibility of one of the state's witnesses. The state argues that these statements were proper responses, tied to evidence in the record, to defense counsel's closing argument which essentially accused the prose-

cutor of putting words in T's mouth and Detective Crevier of putting falsehoods in the witnesses' statements. We agree with the state.

The following additional facts are relevant. On direct examination, the following exchange occurred between the state and T:

"Q. Do you recall, [T], giving a statement to the police ultimately about these events in your early childhood back in July and August of 2015?

"A. Yes, I do.

"Q. And when you were interviewed by the [state] police, were you asked to estimate your age when these different sexual acts occurred?

"A. Yes.

"Q. Were you also asked to provide dates and years that these acts occurred?

"A. Yes, I was.

* * *

"Q. Okay. So initially what age did you believe that this began?

"A. Between the ages of five and six.

"Q. And from there you did the math to figure out the year?

"A. Yes.

"Q. And what year did you provide them?

"A. 2001.

"Q. And when did you indicate to them that you believed it ended?

"A. When I turned ten.

* * *

"Q. Did there come a point in time when you realized that those were not accurate ages, either the start time or the end time?

"A. Yes, I did.

"Q. And how was it that you came to realize that?

"A. I realized it when I thought back and remembered that it had happened when I was in second grade which puts me a little bit older.

"Q. Okay. In fact when—did you report that to me that you remembered being in second grade?

"A. Yes, I did.

* * *

"Q. Are you confident in your testimony today that the abuse had began when you moved to Willington and started second grade?

"A. Yes, I am.

"Q. And that it concluded when you moved to North Carolina?

"A. Yes."

Thereafter, the state called Detective Crevier to testify with respect to his interviews of the victims and the defendant. During direct examination by the prosecutor, Detective Crevier testified about his interview procedure as follows:

"Q. [W]hat is your normal procedure when interviewing a complainant of sexual assault? Do you type as they speak to you, or do you have a conversation with them and then reduce it to writing afterward?

"A. Me, personally, I would interview them first, would gain the particulars of the events, the situation, the who, what, when, where, and then I would transpose that into a written statement on the computer, reviewing it at times if I have to with the complainant. And ultimately my partner or whoever else is sitting in with us would obviously bring up some reminders if we had to add anything in as well the complainant at the time."

Defense counsel elicited the following testimony from Detective Crevier with respect to T's statements on cross-examination:

"Q. Okay. So it's not her recollection that she just says, oh this took place in 2001, I know I was five, and you accept that. You say, sure it wasn't your birthday or you sure it wasn't summer or could it have been fall. You, you sort of ask those kind of questions.

"A. If, if there's any discrepancies on any time frames, we would try to narrow it down—

"Q. Okay.

"A. —to a specific timeframe or year or class, age, what have you.

"Q. Okay. If there was a problem with say the statute of limitations in 2001, would you want to change that date so that it would happen in 2003?

"A. No.

"Q. Okay. But she initially told you it took place in 2001, and that's in her statement. Correct?

"A. I believe so, correct.

"Q. All right. And then—

"A. Began in 2001.

\* \* \*

"Q. [T] comes back and gives you another statement on August 10, 2015 and says that she believes that she was some of these instances probably took place in

2003.

"A. Correct. . . .

\* \* \*

"Q. Now, when you're talking to her, is she telling you—and again, this is not her speaking to you and you typing verbatim what she's saying. This is a back and forth and coming to conclusions or coming to a something that is either suggested or that, that triggers her memory and then she says, yeah that sounds right, and then it's put into the statement as she agrees with it.

"A. The interview would be back and forth, and then as I'm typing it I might review it a little bit with her. And if there's any concern that I want to clarify, I'll, I'll turn back to her and go over what we went over for just so I know it's correct. And then we would do the same at the end too and after, as well as when we print it up and she reads it all, so.

"Q. Okay.

"A. So it, it could change several times, yes.

"Q. And—

"A. Or additions could be made."

Detective Crevier also testified on cross-examination with respect to his interview of the defendant as follows:

"Q. So you, you then tell [the defendant] that when this is done that he has time to read this report and are these his, is this his statement.

"A. Correct.

"Q. Correct?

"A. Correct. There's anything he wants to change, I make note of it. We'll go back in and change it and everything like that.

"Q. But it's not his statement. These are not his words. These are your words.

"A. Correct.

"Q. Okay.

"A. Correct.

"Q. So—

"A. We don't, we don't let anybody type out a statement.

"Q. All right. Or to handwrite a statement?

"A. They may handwrite, come in, and then we may type it and, and tweak it some and everything like—it's been done like that before unless they have an affidavit signed by a notary or something in previous cases.

"Q. So you tweak it. You change it.

"A. We would—correct. We make sure it fits the elements of the crimes and to add things in there to the events we're looking into and to our knowledge of the situation.

"Q. So you tweak it so that it fits what would fit the elements of the crime.

"A. Well, no. We would, we would, we would type it so that it is consistent to what we spoke about.

"Q. Okay.

"A. His—during his interview.

"Q. Okay.

"A. I mean, we're not putting in any, anything that wasn't spoken about or anything like that.

"Q. But I think you just said we would tweak it to fit the elements of the crime.

"A. Well, obviously, if I want to know how many times an incident happened, I'd have to talk to the suspect and get his possible recollection on how many times it would happen.

"Q. Okay.

"A. Because then it would fit the elements of the crime for counts and everything like that.

"Q. Okay. Well counts aren't an element of a crime. Is it?

"A. No . . . ."

Finally, on redirect examination, Detective Crevier testified with regard to T's statements as follows:

"Q. And in this, this particular case, you did in a second interview with [T] help to—attempt to pinpoint when some of those subsequent acts occurred, the ones that were different than what was usually going on with her.

"A. Correct.

"Q. And so you did do that in this case. Correct?

"A. Correct.

"Q. And were you always operating under the assumption that the start date, the start time was in 2001, because she believed she was approximately five or six years of age?

"A. Correct.

"Q. Did you ever try to dissuade her from that? Did you have to explore that any further with her, or did you always operate under that assumption?

"A. She was pretty adamant that that was the date it started.

"Q. Did you ever feel the need to go further with her

to determine perhaps what grade she was in at the time?

"A. No, I did not."

Defense counsel devoted a portion of closing argument to discrediting T's testimony regarding the timing of the abuse, as well as Detective Crevier's investigatory methods. Defense counsel argued that "[T] says she was five. She signed a signed sworn statement. Signed the statement saying she was five. It was the state who told her that she was in second grade, because it's the only way her story made sense. The state said do you and I have a chance to talk to each other. Does, did that remind you? Did that make you remember that you would go to second grade? Yes. So you must've been eight as you were living with your grandfather. That's the only way the story makes sense."

Defense counsel further argued: "And then [Detective Crevier] said a couple of other really interesting things. When I asked is this, is this [the defendant's] statement or is this statement yours, he said that's mine. It's mine. . . . That's beyond—that's unconscionable. This is a signed, sworn statement, something that a person supposedly giving to you to account for an event. And when a person that's a suspect, your prime suspect in a case who's going to be arrested based on his statement, comes to you, and you say—use your words instead of his and [then] have him sign it. That's almost criminal, almost. Then, on top of it, he said well, we tweaked his statements, I tweaked the statements to fit the element of the crime. I tweak the statements to fit the element of the crime? Really? So if the guy's not giving you the right answer, you're going to put it in there. . . ." Defense counsel continued: "[Detective Crevier] is skilled. He has taken how many courses. He's been a—he's been a detective for twenty years. Twenty years, he's never made a mistake. That's because he's skilled at interviewing, getting confessions, getting people to tell him what he really wants to hear, tweaking those confessions, tweaking those statements, taking those advanced, advanced interviewing technique classes that he says he's taken so many of. Oh he was proud to tell us what he could do, and he did it."

During rebuttal argument, the prosecutor made the following comments that the defendant claims were improper. "I'm not quite sure I know where to begin. . . . I've been accused of putting words in my witnesses' mouths. But for accusations that the state police have put words in statements that aren't true in order to accomplish what they're trying to accomplish. These are very serious accusations, and I would submit to you that there is no place in the evidence to support those accusations. And frankly, I find it offensive." With respect to Detective Crevier's interview, the prosecutor argued: "He's not going to write things in there like what kind of weather it was out that day if it's not relevant to the crime. He's not going to talk about erro-

neous things that aren't related to the crimes that are being investigated. When he says he tweaked the statement to include—to fit the elements of the crime, he means he [is] putting information in there to meet the elements of the crime. Because that's what we need as state's attorneys. Can we prove this case? Can we—do we have sufficient evidence to meet the elements of the crime. Because we take this seriously. We take meeting the elements of every charge in every information very seriously, because that is our job. And we take the credibility of our witnesses very seriously as we review their testimony and their statements to ensure that there's consistency and that it makes sense. That is our job. And that is the job of the detective."

The defendant claims that these comments constituted improper vouching for the state's credibility. We do not agree. "The prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor. . . . The jury is aware that he has prepared and presented the case and consequently, may have access to matters not in evidence . . . which the jury may infer to have precipitated the personal opinions. . . . While the prosecutor is permitted to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom, he is not permitted to vouch personally for the truth or veracity of the state's witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Payne*, 260 Conn. 446, 454, 797 A.2d 1088 (2002).

Our careful review of the record reveals that the prosecutor's statements in rebuttal closing argument did not constitute improper vouching. "A prosecutor's mere use of the words 'honest,' 'credible,' or 'truthful' does not, per se, establish prosecutorial impropriety." *State* v. *Ciullo*, 314 Conn. 28, 41, 100 A.3d 779 (2014). Although the state explained that it takes the issue of witness credibility seriously, its response was reasonable in light of the defendant's sharp comments that Detective Crevier's method of transcribing statements was "unconscionable" and "almost criminal," and the corresponding inference that he would nefariously "tweak" and place favorable information into the statements. See *State* v. *Thompson*, 266 Conn. 440, 469, 832 A.2d 626 (2003) (state did not improperly vouch for police when it explained, in part, that detectives " 'want to see that justice is served' " because remarks were in response to defendant's theory that statements obtained by police were product of coercion). The state also stated, on numerous occasions throughout its rebuttal argument, that it was the jury's job to assess credibility.

In support of his claim that the prosecutor's rebuttal argument was improper, the defendant cites to several cases in which the court concluded that the statements at issue improperly expanded the record during closing argument. See, e.g., *State* v. *Ancona*, 270 Conn. 568, 600–601, 854 A.2d 718 (2004) (prosecutor's reference to " 'blue code' " of silence among police officers who witness criminal conduct by another officer was improper when no evidence of " 'blue code' " was presented at trial), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005); *State* v. *LaVallee*, 101 Conn. App. 573, 582, 922 A.2d 316 (prosecutor's statement that officer had warned witness of penalties accompanying filing of false statement was not adduced at trial), cert. denied, 284 Conn. 903, 931 A.2d 267 (2007).

These authorities are readily distinguishable from the present case. Here, the prosecutor's comments, which were in direct response to the arguments of defense counsel, did not expand the record by arguing that the state takes its job seriously. As reflected in the portions of direct examination and cross-examination recited previously in this opinion, the defense clearly sought to undermine Detective Crevier's interview techniques, as well as T's claim of when the sexual abuse began. During closing argument, defense counsel suggested that Detective Crevier would "tweak" statements provided to him in order to strengthen the state's case. On the basis of our review of the record as a whole, we are not convinced that the prosecutor's rebuttal to those allegations—in particular, that the state took its prosecutorial responsibilities and witnesses' credibility seriously—was improper; her comments were directly tied to the defense's interpretation of the evidence adduced at trial and did not improperly extend beyond the record.[11] See *State* v. *Moore*, 293 Conn. 781, 814–15, 981 A.2d 1030 (2009), cert. denied, 560 U.S. 954, 130 S. Ct. 3386, 177 L. Ed. 2d 306 (2010).

## II

Having found that prosecutorial impropriety occurred, as explained in part I A of this opinion, "we ask whether the trial as a whole was fundamentally unfair and [whether] the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Felix R.*, 319 Conn. 1, 16, 124 A.3d 871 (2015). Our determination of whether the defendant's due process right to a fair trial was denied as a result of the impropriety is aided by an examination of the following six factors elucidated in *Williams*: "[1] [T]he extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures

adopted . . . and [6] the strength of the state's case." (Internal quotation marks omitted.) Id., quoting *State* v. *Williams*, supra, 204 Conn. 540. After applying these factors to the prosecutor's misstatements that the state's experts were prohibited as a matter of law from meeting with the victims, we agree with the state that the defendant was not deprived of his due process right to a fair trial.

Turning to the first *Williams* factor, the state contends that the defense invited the impropriety when defense counsel argued in closing "[a]nd yet, she can't testify in specifics about either one of these girls, not because she not only didn't see them *because she's not allowed to*, but it's all generalizations." (Emphasis added.) We agree that such remark reflects that it was the defense who initially argued that one of the state's experts was precluded from meeting with the victims.

With respect to the second *Williams* factor, the severity of the impropriety is lessened by the fact that the defendant did not object to the state's closing argument. "Indeed, counsel's failure to object at trial, while not by itself fatal to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . [necessary] . . . [to] clearly depriv[e] . . . the defendant of a fair trial . . . ." (Internal quotation marks omitted.) *State* v. *Daniel W.*, 180 Conn. App. 76, 112, 182 A.3d 665, cert. denied, 328 Conn. 929, 182 A.3d 638 (2018). Even assuming that the misstatement of the law was severe, "the severity of the impropriety is often counterbalanced in part by the third *Williams* factor, namely, the frequency of the [impropriety] . . . ." (Internal quotation marks omitted.) Id., 113. To that end, the prosecutor's misstatement of the law was not frequent and was confined to her rebuttal argument. The defendant does not argue otherwise, and it is evident that the improprieties, stated in quick succession, were not sufficiently severe or frequent to deprive the defendant of a fair trial. Therefore, we weigh the second and third factors in favor of the state.

The fourth *Williams* factor, the centrality of the impropriety to the critical issues in the case, weighs slightly in favor of the defendant. The state's experts opined on how children victimized by sexual abuse generally respond to the abuse and their abusers. The prosecutor's statements that the experts had to speak in generalizations because they were not permitted to meet with the victims was directly aimed at reinforcing the credibility of T and A vis-à-vis the experts' opinions. Because this case was based solely on testimony and was not corroborated by any physical evidence, the prosecutor's statements were aimed at the central issue of credibility. When viewed in the context of the entire trial, however, the impact of the impropriety was minimal. That is, the jury acquitted the defendant of two

counts in the case against T, demonstrating its ability to "filter out the allegedly improper statements and make independent assessments of credibility." *State* v. *Ciullo*, supra, 314 Conn. 60.

The fifth *Williams* factor also weighs in favor of the state. Although the trial court did not address the prosecutor's misstatement with any specific curative instructions, any improper effect was reduced by the court's final instructions to the jury following closing arguments. Specifically, the court explained that it was solely the jury's function to assess credibility and that none of the arguments made by the attorneys constituted evidence. Moreover, the court correctly instructed the jury that the law required the experts to testify in general terms. See, e.g., *State* v. *Dawson*, 188 Conn. App. 532, 566–70, 205 A.3d 662 (prosecutor's misstatement of law of constructive possession three times during closing argument constituted impropriety that did not deprive defendant of fair trial, especially given trial court's correct statement of law to jury), cert. granted on other grounds, 333 Conn. 906, 215 A.3d 731 (2019). "In the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *State* v. *Thompson*, supra, 266 Conn. 485.

Finally, the sixth factor weighs in the state's favor because the state's case was fairly strong, even without physical evidence. As our Supreme Court has said, "[i]n sexual abuse cases . . . the absence of conclusive physical evidence of sexual abuse does not automatically render [the state's] case weak . . . ." (Internal quotation marks omitted.) *State* v. *Felix R.*, supra, 319 Conn. 18. "The sexual abuse of children is a crime which, by its very nature, occurs under a cloak of secrecy and darkness."[12] Id. Significantly, "our Supreme Court has never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial." (Internal quotation marks omitted.) *State* v. *Ross*, 151 Conn. App. 687, 705, 95 A.3d 1208, cert. denied, 314 Conn. 926, 101 A.3d 271 (2014).

As set forth previously in this opinion, both T and A testified about the sexual abuse they endured by the defendant. Although there was no physical evidence corroborating their testimony, it was supported by several other witnesses offered by the state in its case-in-chief as evidenced by the following additional facts. T and A repeatedly explained that they delayed disclosing the abuse because they were afraid of the possible repercussions. Murphy-Cipolla substantiated those reasons as bases for delayed disclosure in her testimony. Additionally, the defendant's daughter, M,[13] testified that A had told her on the night of July 14, 2015, that the defendant touched her breast. She also testified that, just prior to T and A's move to North Carolina,

neither girl wanted to spend time at the defendant's home and that such behavior "seemed different" than it had been in the past. The defendant's daughter-in-law, J, testified that, in the summer of 2015, T told her that she had been sexually assaulted by the defendant and feared for J's children, who were living with the defendant at that time. Moreover, T's girlfriend, C, testified that she met T in 2012 and that sometime in 2013, T told C that the defendant sexually assaulted T during the time period and in the manner consistent with T's testimony.[14] Therefore, even if we were to assume that the lack of physical evidence and the length of time between the crime and the disclosure tempered the strength of the state's case, "it was not so weak as to be overshadowed by a single improper comment . . . ." *State* v. *Carlos E.*, 158 Conn. App. 646, 669, 120 A.3d 1239, cert. denied, 319 Conn. 909, 125 A.3d 199 (2015).

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

[1] General Statutes § 53a-70 provides in relevant part: "(a) A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[2] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-73a (a) provides in relevant part: "A person is guilty of sexual assault in the fourth degree when: (1) Such person subjects another person to sexual contact who is (A) under thirteen years of age and the actor is more than two years older than such other person . . . ."

Although § 53a-73a has been amended by the legislature several times since the events underlying the present case; see, e.g., Public Acts 07-143, § 2; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[4] General Statutes § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts . . . of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . a class B felony for a violation of subdivision (2) of this subsection, except that, if the violation is of subdivision (2) of this subsection and the victim of the offense is under thirteen years of age, such person shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court."

Although § 53-21 has been amended by the legislature several times since the events underlying the present case; see, e.g., Public Acts 07-143, § 4; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[5] The victims' father, L, is the defendant's son.

[6] The evidence at trial revealed that the victims lived in North Carolina for one year and thereafter returned to Connecticut. T testified that, upon returning from North Carolina, she and A lived with the defendant and his wife for a period of time.

[7] Trooper O'Brien took the statement of the defendant's wife on August 4, 2015, wherein she stated, among other things, that one time T told her that the defendant put his arm around T while in his bedroom and that made her feel "uncomfortable." According to the defendant's wife, the defendant responded that he had "barely touched her."

[8] The defendant denied that anything of a sexual nature happened between him and A. Specifically, with regard to T, the defendant stated that, on several occasions, he woke up from a nap with T's hand on his penis. He stated that, on other occasions, T would rub her genital area on his leg and groin area. According to the defendant, the "last time [he] took a nap" was when he woke up to T on his chest "moving [her vagina] around . . . a couple of inches from [his] face." The defendant was "surprised [by] this." The statement was signed by the defendant as an attestation of its accuracy.

[9] With respect to the allegations concerning T, the state charged the defendant in Docket No. TTD-CR-15-0108192-T. With respect to the allegations regarding A, the state charged the defendant in Docket No. TTD-CR-16-0108519-T. The matters were tried together.

[10] As our Supreme Court has held, "our concerns about indirect vouching . . . require us to limit expert testimony about the behavioral characteristics of child sexual assault victims admitted under *State* v. *Spigarolo*, supra, 210 Conn. 378–80, to that which is stated in general or hypothetical terms, and to preclude opinion testimony about whether the specific complainant has exhibited such behaviors." (Citations omitted.) *State* v. *Favoccia*, supra, 306 Conn. 803.

[11] Assuming, arguendo, that the state's comments described in part I B of this opinion constituted improper vouching for the credibility of the state and the police, we would nevertheless conclude that the defendant's due process claim would fail under our assessment of the *Williams* factors. Specifically, the comments were invited by defense counsel because of her own comments regarding T's and Detective Crevier's credibility during closing argument. The state's comments were not frequent, as they only occurred during rebuttal closing argument. Although the credibility of the witnesses was a central issue in this case, as it was without physical evidence, the trial court explained that the arguments of counsel were not evidence and that it was the jury's job to assess credibility. Finally, the state's case was fairly strong because it was buttressed by the testimony of various witnesses that corroborated the victims' testimony and version of events. See part II of this opinion.

[12] In *Felix R.*, our Supreme Court further explained that, on the facts of that case, "[i]t is not surprising, therefore, for there to be a lack of corroborating physical evidence in cases that are factually similar to the present case, where the victim submitted to the sexual abuse of her father in the face of his threats to physically harm her and send her back to the Dominican Republic if she told anyone. Given the rarity of physical evidence in these circumstances, a case is not automatically weak just because a child's will was overborne and he or she submitted to the abuse of his or her own parent. To conclude otherwise would place an insurmountable obstacle in the path of many sexual assault prosecutions." *State* v. *Felix R.*, supra, 319 Conn. 18–19. Although the factual circumstances in *Felix R.*, evidenced from this quoted passage, are different from those in the present case, our Supreme Court's guidance is no less apropos here.

[13] The victims are M's nieces.

[14] In its final instructions to the jury, the court gave the following charge with respect to, inter alia, C's, J's, and M's testimony: "[I]n cases involving an allegation of a sexual offense, the state is permitted in certain circumstances to introduce evidence of out-of-court statements to other persons about what occurred. The only reason that the evidence is permitted is to negate the inference that the complainant failed to confide in anyone about the sexual offense. In other words, the narrow purpose of the constancy evidence is to negate any inference that [T] or [A] failed to tell anyone about the sexual offense and, therefore, that [T's] or [A's] later assertion to the police could not be believed.

"Constancy evidence is not evidence that the sexual offense actually occurred, or that [T] or [A] is credible. It merely serves to negate any inference that, because of [T's] or [A's] assumed silence, the offense did not occur. It does not prove the underlying truth of the sexual offense. Constancy evidence only dispels any negative inference that might be made from [T's] or [A's] assumed silence."

In his reply brief, the defendant appears to contend that the state's claim that its case was strong in light of, inter alia, C's, J's, and M's testimony

was misleading because their testimony could be used only as constancy evidence. Not only is this claim inadequately briefed; see, e.g., *Getty Properties Corp.* v. *ATKR, LLC*, 315 Conn. 387, 413, 107 A.3d 931 (2015); we reiterate that "[c]onstancy of accusation testimony can properly be used to corroborate the victim's testimony." *State* v. *Salazar*, 151 Conn. App. 463, 472, 93 A.3d 1192 (2014), cert. denied, 323 Conn. 914, 149 A.3d 496 (2016). Congruent with that principle, the state's argument that the constancy witnesses' testimony strengthened their case is proper. We also note that the record reveals that in the defendant's cross-examination of T and A, they were asked several times about reporting the abuse. The victim in a sexual assault case may testify on "direct examination regarding the facts of the sexual assault and the identity of the person or persons to whom the incident was reported. . . . Thereafter, if defense counsel challenges the victim's credibility by inquiring, for example, on cross-examination as to any out-of-court complaints or delayed reporting, the state will be permitted to call constancy of accusation witnesses . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Daniel W. E.*, 322 Conn. 593, 629, 142 A.3d 265 (2016).

---